UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY QUISENBERRY,

                Plaintiff,                    Case No. 2:16-cv-11156
                                              District Judge Marianne O. Battani

v.                                      Magistrate Judge Anthony P. Patti

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____/

## RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 25) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 20)

**I.**     **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment (DE 25), **DENY** Plaintiff's motion for summary judgment (DE 20), and

**AFFIRM** the Commissioner's decision.

**II.**     **REPORT**

       Plaintiff, Kimberly Quisenberry, brings this action under 42 U.S.C. § 405(g)

for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her applications for social security disability insurance

benefits ("DIB") and supplemental security income ("SSI"). This matter is before

the United States Magistrate Judge for a Report and Recommendation on

Plaintiff's motion for summary judgment (DE 20), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 25), and the administrative record (DE 14).

### A.    Background

On August 18, 2009, Plaintiff filed an initial application for DIB, followed by an application for SSI on September 24, 2009, alleging she has been disabled since May 28, 2009.  (R. at 145.)   Her applications were denied and she sought a *de novo* hearing before an administrative law judge ("ALJ").  On May 18, 2011, ALJ Anthony Smereka issued an opinion in which he found Plaintiff to not be disabled.  (R. at 145-155.)  On October 17, 2012, the Appeals Council remanded the case with instructions to: (1) further evaluate the severity of Plaintiff's anemia; (2) reconsider Plaintiff's RFC, specifically whether she could perform work-related mental activities generally required by competitive employment; and (3) obtain supplemental evidence from a vocational expert ("VE").  (R. at 161-62.)

ALJ Smereka held a second hearing on February 21, 2013, and subsequently issued a decision which again found Plaintiff not to be disabled.  (R. at 20-87.) The Appeals Council denied Plaintiff's request for review on July 21, 2014.  (R. at 1-4.)  ALJ Smereka's decision thus became the Commissioner's final decision and Plaintiff timely commenced her first action in federal court.  *Quisenberry v. Comm'r of Soc. Sec.*, No. 14-cv-13500 (E.D. Mich. June 29, 2015).  When Plaintiff

2

filed her motion for summary judgment in that case, the Commissioner stipulated

to remand to a different ALJ with the following instructions:

> Upon remand, the Administrative Law Judge ("ALJ") shall give
> further consideration to the claimant's maximum residual functional
> capacity during the entire period at issue and provide a rationale with
> specific references to evidence of record in support of assessed
> limitations.  *See* Social Security Ruling (SSR) 96-8p.  In so doing, the
> ALJ will evaluate all the opinions of record, pursuant to the provisions
> of 20 CFR §§ 404.1527, 416.927, and SSRs 96-2p, 96-5p, and 96-6p,
> and explain the weight given to such opinion evidence.

(R. at 769-770.)

ALJ B. Lloyd Blair held a third hearing on November 16, 2015, after which

he issued a decision again denying Plaintiff benefits.  (R. at 678-733.)  Rather than

raising the issue with the Appeals Council, Plaintiff timely filed the instant action.

**B.     Plaintiff's Medical History and Hearing Testimony**

Plaintiff has an extensive medical history, documenting both physical and

mental impairments.  It will be discussed as necessary in the Analysis section

below.

**C.  The Administrative Decision**

In his December 7, 2015 decision, the ALJ first concluded that Plaintiff met

the insured status requirements through December 31, 2014.  (R. at 680.)  At **Step**

**1** of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 28, 2009.  (Id.)

At **Step 2**, the ALJ found that Plaintiff had the following severe impairments:  coronary artery disease post stenting, anemia, chronic obstructive pulmonary disease, learning disorder, depression with anxiety, and substance abuse in complete remission.  (R. at 681.)  At **Step 3**, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listings 3.02, 4.04, 7.05, 12.02, 12.04, 12.05, 12.06, and 12.09.  (R. at 682-85.)

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Prior to undertaking Step 4, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[2] and determined that she could perform light work,[3] with several limitations, including never performing over the shoulder reaching, climbing ropes, ladders, or scaffolds. He also limited her to performing "simple, unskilled work with one, two, or three step instructions," and restricting her from jobs that "involve concentration on detailed/precision tasks or multi-tasking, reading, computing, calculating, or problem-solving" and those with "fast-paced production work" and contact with the general public. (R. at 685-86.) At **Step 4**, the ALJ concluded that Plaintiff was unable to perform her past relevant work. (R. at 697.) At **Step 5**, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy. (R. at 697.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 698.)

---

[2] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

### D. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to

benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### E. Analysis

Plaintiff advances four arguments as to why the ALJ committed reversible error warranting remand. First, she asserts that the ALJ erred at Step 2 by failing

to find her cognitive impairment to be severe. Second, she contends that the ALJ

likewise erred by failing to find that her cognitive impairment met Listing

12.05(C). Third, Plaintiff argues that the ALJ improperly evaluated the opinion

evidence in the record. Finally, she asserts that the ALJ ignored the impact of the

moderate limitations set out by Ron Marshall, Ph.D., when assessing her RFC.

The Commissioner opposes the motion, asserting that the ALJ's decision is

supported by substantial evidence. I will address each argument in turn.

## 1. Step 2 Determination of Severe Impairments.

At Step 2, the ALJ found Plaintiff's learning disorder to be a severe

impairment, but did not address what Plaintiff refers to as a separate "cognitive

impairment." (R. at 680-81, DE 20 at 28.) As a result, the ALJ limited her to

simple, unskilled work with one, two, or three step instructions, that does not

involve concentration on detailed/precision tasks, multi-tasking, reading,

computing, calculating, or problems solving. He also excluded fast-paced

production work or work that requires contact with the general public. (R. at 696.)

Plaintiff asserts that her cognitive impairment should be treated as a distinct

condition and argues that the ALJ's analysis of her learning disorder does not

encompass the limited functional abilities resulting from her cognitive impairment.

As support, she relies on the results of the Weschler Adult Intelligence Scale,

performed by Elaine Tripi, Ph.D., which recorded Plaintiff's IQ as 67, placing her

"within the extremely low range of intelligence." (R. at 475-77.) Dr. Tripi further determined, based on the results of a Wide Range Achievement Test, that Plaintiff falls at the eighth grade level in reading, the sixth grade level in spelling, and the third grade level in arithmetic. (R. at 476.) Plaintiff also points to other evidence in the record stating that she has "limited intellectual functioning." (R. at 402.)

Defendant counters that the ALJ did not err at Step 2 because Plaintiff has never been diagnosed with an intellectual disability or cognitive impairment, beyond her learning disorder. Defendant contends that the ALJ's decision at Step 2 is supported by substantial evidence because of Plaintiff's reports of daily activities, evidence of a rational thought process, fluent and goal directed speech, and her engagement in semiskilled work activity, all of which demonstrate that she did not suffer from a cognitive impairment requiring further limitation than that opined in the RFC.

The ALJ's decision at Step 2 is indeed supported by substantial evidence. First, as the ALJ notes, neither of Plaintiff's treating physicians (Vijayalaksmi Lingam, M.D. and Corina Lazar, M.D. "included any narrative statements in their treatment notes to suggest that the claimant had any significant cognitive difficulties." (R. at 690.) To the contrary, Drs. Lingam and Lazar *repeatedly* assessed Plaintiff as having intact speech, language, memory, and fund of knowledge, with goal-directed thought processes and content within the normal

9

limits.  (R. at 1109-1110, 1120, 1136, 1154, 1179, 1187, 1233, 1240, 1249.)  They

also found her attention/concentration to be adequate and that she was oriented to

person time, and place.  (R. at 1128, 1164, 1250.)

Nor did Plaintiff ever receive a diagnosis of cognitive impairment.  Plaintiff

relies on the results of the IQ tests administered by Dr. Tripi, but those results are

not sufficient to establish a medically determinable cognitive impairment.  The

Sixth Circuit has explained this issue as follows:

> While it is well established that an intelligence score may be helpful
> in assessing whether an individual has a medically determinable
> mental impairment, it is not the sole determinative criteria, and
> notably the complainant has not cited a single case where a low I.Q.
> score was the sole basis for finding an intellectual disability.  *See* 20
> C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a); 20 C.F.R. §
> 404.1520a.  As the C.F.R. clarifies, "intelligence tests are only part of
> the overall assessment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §
> 12.00(D)(6)(a).  "The narrative report that accompanies the test results
> should comment on whether the I.Q. scores are considered valid and
> consistent with the developmental history and *the degree of functional
> limitation*." *Id.* (emphasis added). Case law is consistent on this point.

*Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 559–60 (6th Cir. 2014)

(emphasis in original).  In addition, as Defendant points out, <u>even Dr. Tripi did not</u>

<u>make a diagnosis of cognitive impairment</u>.

Finally, Plaintiff has reported that she has no problems taking care of her

personal needs, communicating with others, or learning.  (R. at 1066.)  Moreover,

*arguendo*, if Plaintiff actually has a cognitive impairment, she fails to demonstrate

that it is "severe," such that it "significantly limits [her] . . . mental ability to do

10

basic work activities."  20 C.F.R. § 404.1520(c).  Notably, her past relevant work as a caregiver was semi-skilled.  (R. at 725.)  Moreover, although she did not get the full certification, Plaintiff attended school for nurse's aide training.  (R. at 106.)  Based on the foregoing, the ALJ's exclusion of cognitive disorder from the list of severe impairments was not in error.

Even if the ALJ had made the decision in error, the error is harmless because he found her learning disorder to be a severe impairment and accounted for the same at Step 4.  The ALJ specifically explained that Plaintiff was limited to simple, unskilled work with one, two, or three step instructions, that does not involve concentration on detailed/precision tasks, multi-tasking, reading, computing, calculating, or problems solving, and excluded fast paced production work as a result of her learning disorder.  (R. at 696.)  Accordingly, even if the ALJ had erred, any error at Step 2 as to the severity of Plaintiff's cognitive impairment was rendered harmless.  *See Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x. 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) ("Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional

11

capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error."), *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("Nevertheless, any error here became harmless when the ALJ reached the proper conclusion that Mrs. Carpenter could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.").

## 2.   Listing 12.05C

Plaintiff argues that the ALJ committed reversible error by failing to determine that her cognitive impairment met or medically equaled Listing 12.05C. Listing 12.05C[4] provides as follows:

> Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> *       *       *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

---

[4] Listing § 12.05C was revised, effective March 27, 2017. However, the ALJ and parties relied on the earlier version of the Listing. As such, any citation to the Listing reflects the pre-March 2017 version discussed in the parties' briefs.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.05C (Effective: September 29, 2016 to January 16, 2017).  In addition, a "prerequisite to the evaluation of disability on the basis of a mental disorder is that there must be 'documentation of a medically determinable impairment.'"  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting 20 C.F.R. Pt. 404, App. 1, §12.00(A)).

Plaintiff describes her history, including attending special education classes and having only a 9th grade education as evidence that the onset of her intellectual disability occurred before age 22.  She points to her Full Scale IQ score of 67 assessed by Elaine Tripi, Ph.D., and asserts that this score, along with the fact that the ALJ found other severe impairments at Step 2, is sufficient to meet the requirements of 12.05C.

Plaintiff is incorrect.  The Social Security Regulations recognize that "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the [results of standardized intelligence tests] should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation."  20 C.F.R. Subpt. P., App. 1, Listing 12.00(6)(a).  Here, as the ALJ correctly acknowledged, "Dr. Tripi did not expressly state that she felt the claimant's test scores could be considered a valid interpretation of her intellectual functioning." (R. at 685.)

13

While Plaintiff attempts to shift this burden somewhat by noting that Dr. Tripi

never said that the scores were *not* valid and consistent, the above Regulation

clearly requires a proactive comment on the *validity and consistenc*y of the tests.

Dr. Tripi did note that, Plaintiff actually "gave up" on "several" tests

because she could not focus and concentrate.  (R. at 476.)  The ALJ cites this

information as an additional reason to question the validity of the results.  (R. at

685.)  Plaintiff argues that the fact that she could not focus and concentrate actually

weighs in her favor and tends to show an issue of cognitive impairment.  However,

Listing 12.05C does not have a "focus and concentration" requirement, and

substantial evidence supports the ALJ's treatment of Dr. Tripi's report.  As noted

above, Plaintiff has never been diagnosed with a cognitive impairment—even by

Dr. Tripi—and her treating physicians consistently described her as having intact

speech, language, memory, and fund of knowledge, with goal-directed thought

processes and content within the normal limits.  (R. at 1109-1110, 1120, 1136,

1154, 1179, 1187, 1233, 1240, 1249.)  Just as importantly, they consistently found

her attention and concentration to be adequate, indicating that perhaps the lack of

focus during her session with Dr. Tripi was out of the ordinary and further calling

into question the validity of the test results.  (R. at 1128, 1164, 1250.)  It is also

unclear whether her "giving up" on the tests could be related to her learning

disorder, which was found to be a severe impairment and factored into her RFC.

14

Furthermore, irrespective of her *reason* for not completing the IQ tests, the *fact* that she did not do so calls into question the accuracy of the results.

In sum, the "diagnostic definition is not satisfied merely because one Verbal IQ score is within the range contemplated by subsection (C) of the severity criteria," and Plaintiff can point to only one unsubstantiated IQ score in the record within the range of 60-70. *Smith-Johnson*, 579 F. App'x at 433. Even if she could establish the requisite score, she has not demonstrated the onset of deficits in adaptive functioning before age 22. Specifically, her 9th grade education and failure to earn a GED are insufficient to demonstrate the requisite deficits and would appear to be consistent with her diagnosed learning disorder. *Foster v. Halter*, 279 F.3d 348, 352-55 (6th Cir. 2001) (finding substantial evidence to support the ALJ's conclusion that the plaintiff did not establish deficits in adaptive functioning before age 22 where he had a 9th grade education and did not obtain a GED). Again, Plaintiff has never been diagnosed with a cognitive impairment and the ALJ did not err in his conclusion that she did not meet Listing 12.05C.

### 3.    Weighing of Opinion Evidence

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(b). The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis

and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 CFR § 404.1527(e)(2)(i). The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.[5] *Wilson v. Comm'r*

---

[5] An exception exists for treating source opinions on issues that are reserved to the Commissioner, which "are never entitled to controlling weight or special significance." S.S.R. 96-5p, 61 FR 34471-0, at *34473. Examples of issues reserved to the Commissioner include:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

*of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not

give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.; see also* 20 C.F.R. § 404.1527(c).

However, while an ALJ must "always give good reasons in [the ALJ's]

notice of determination or decision for the weight [the ALJ] give[s] your treating

source's opinion,"  20 C.F.R. § 416.927(c)(2), and  "must be sufficiently specific

to make clear to any subsequent reviewers the weight the adjudicator gave to the

treating source's medical opinion and the reasons for that weight,"  *Friend v.*

*Comm'r of Soc. Sec.*, No. 09-3889, 375 F. App'x 543, 550 (6th Cir. 2010) (per

curiam) (internal quotation omitted), there is no *per se* rule that requires a written

articulation of each of the six regulatory or "*Wilson* factors" listed in 20 C.F.R. §§

404.1527(c)(2)-(6), 416.927(c)(2)-(6). *Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x

---

2. What an individual's RFC is;
3. Whether an individual's RFC prevents him or her from doing past relevant work;
4. How the vocational factors of age, education, and work experience apply; and
5. Whether an individual is "disabled" under the Act.

*Id.*

216, 222 (6th Cir. 2010). In other words, the regulations do not require "an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804-805 (6th Cir. 2011) (citing § 404.1527(d)(2)).

Moreover, the failure to discuss the requisite factors may constitute harmless error: (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [§ 1527(c) ]–the provision of the procedural safeguard of reasons–even though she has not complied with the terms of the regulation." *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir.2006) (quoting *Wilson*, 378 F.3d at 547). *See also, Betty v. Comm'r of Soc. Sec.,* No. 15-CV-10734, 2016 WL 1105008, at *4 (E.D. Mich. Feb. 17, 2016), *report and recommendation adopted*, No. 15-CV-10734, 2016 WL 1090554 (E.D. Mich. Mar. 21, 2016).

The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's

18

application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Plaintiff takes issue with the ALJ's weighing of the opinions of Pamela Herringshaw, Ph.D., Ron Marshall, Ph.D., Elaine Tripi, Ph.D., Aaron Anderson, D.O., Dawn Gventer, Psy.D., and Paul Haduck, D.O.  For the reasons stated below, I find that the ALJ's opinion gives good reasons for discounting the medical opinions at issue and that the Commissioner has met the goal of § 1527(c). *Francis*, 414 F.App'x at 805  (quoting *Wilson,* 378 F.3d at 547).  I also find that the opinion "'permits the claimant and [this] reviewing court a clear understanding of the reasons for the weight given [to the] treating physician's opinion[.]'" *Francis,* 414 F.App'x at 805 (quoting *Friend*, 375 F.App'x at 550).

### a.      **Pamela Herringshaw, Ph.D.**

Dr. Herringshaw examined Plaintiff on December 21, 2009 on behalf of the State Agency.  She diagnosed Plaintiff with panic disorder, major depressive disorder, cocaine use in remission, marijuana use in remission, and dependent personality disorder, and assessed her prognosis for returning to competitive employment as "fair to poor."  (R. at 402-403.)

19

The ALJ assigned little weight to Dr. Herringshaw's opinion for several reasons.  First, he correctly noted that her statement that Plaintiff was unable to work was not entitled to controlling weight.  *See* Soc. Sec. Ruling 96-5p, 61 FR 34471-0, at *34473.  Second, he found that her opinion was inconsistent with the medical evidence in the record as a whole, "including the claimant's history of mental health treatment, the mental status examination findings of the claimant's treating and examining providers, and the claimant's reported activities of daily living."  (R. at 695-96.)  Finally, he noted that Dr. Herringshaw's opinion was vague and did not "propose any specific functional limitations that would preclude the claimant from returning to 'productive employment.'"  (R. at 696.)

As a preliminary matter, Dr. Herringshaw saw Plaintiff only one time and does not qualify as a treating physician.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (6th Cir. 2006).  Accordingly, the opinion was not entitled to special deference, including the requirement that the ALJ give good reasons for not providing it with controlling weight.  *Id.* (concluding that the "regulation at issue in *Wilson* simply does not apply" where the ALJ "neither misstated nor ignored a treating physician's opinion. . . .").  The ALJ therefore needed only to consider the opinion, and he clearly did so here by discussing the opinion at length.  (R. at 689 and 694-95.)

The ALJ's decision to give little weight to Dr. Herringshaw's opinion is supported by substantial evidence.  First, the ALJ did not err in discounting Dr. Herringshaw's opinion based on its inconsistency with Plaintiff's report of her activities of daily living.  While Plaintiff points to evidence in the record to demonstrate that her activities of daily living were limited, the ALJ relied on other evidence in the record, including Plaintiff's testimony that she cooks, does laundry, shops for groceries, and takes care of pets.  (R. at 693, 718-19.) [6]  The Court cannot reweigh the evidence in the record related to Plaintiff's activities of daily living and must "defer to an agency's decision even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."  *Foster v. Halter*, 297 F.3d 348, 353 (6th Cir. 2001).  Here, there is.

Moreover, the ALJ also assigned little weight to the opinion because it was inconsistent with medical evidence and the record as a whole, and this conclusion is also supported by substantial evidence.  For example, as noted above, her treating physicians consistently described her as having intact speech, language, memory, and fund of knowledge, with goal-directed thought processes and content within the normal limits.  (R. at 1109-1110, 1120, 1136, 1154, 1179, 1187, 1233,

---

[6] Notably, Plaintiff does not dispute that she takes care of pets, but points out that she only took care of a "dog and bird" and received help from her husband and son to do so.  (DE 20 at 41.)  It is unclear how this contradicts the ALJ's statements, as domesticated dogs and birds are pets.

1240, 1249.)   At her March 23, 2013 appointment with Aaron Anderson, D.O.,

Plaintiff explained that she could read and write.  (R. at 614.)  Dr. Anderson

described her as "alert and oriented to person, place, and time" with no

disorientation.  (R. at 615.)  At her March 27, 2013 appointment, Dawn Gventer,

Psy.D. did note that Plaintiff had impaired intermediate memory and concentration,

but also described her as oriented in all spheres with intact recent memory and

appropriate judgment and insight.  (R. at 632-33.)  In sum, although there is

evidence in the record demonstrating that Plaintiff had some cognitive difficulties,

there is substantial evidence to indicate that they are not as severe as that opined by

Dr. Herringshaw.  Moreover, Plaintiff is hard-pressed to show how the ALJ's RFC,

which limits Plaintiff to simple, unskilled work with one, two, or three step

instructions, does not account for those cognitive limitations.  Accordingly, the

ALJ did not err in his assignment of little weight to Dr. Herringshaw's opinion.

### b.      Ron Marshall, Ph.D.

On January 5, 2010, State Agency psychologist Dr. Marshall completed a

psychiatric review technique form (R. at 405-418) and a mental RFC assessment

(419-422).  In Section I of the mental RFC form, Dr. Marshall found that Plaintiff

had moderate limitations in her abilities to: (1) understand, remember, and carry

out detailed instructions; (2) maintain attention and concentration for extended

periods; (3) perform activities within a schedule, maintain regular attendance, and

22

be punctual within customary tolerances; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms; (5) maintain socially appropriate behavior; and (6) travel in unfamiliar places or use public transportation. (R. at 419-420.) In Section III of the form, he noted that Plaintiff retained "the ability to do rote tasks within medical limitations," to "follow instructions," and to "work with others," but that her limited intellectual ability "precludes complex tasks." (R. at 421.) The ALJ assigned partial weight to the opinion, noting that, since Dr. Marshall's assessment, he had "subsequently received medical evidence that supports *further mental limitations.*" (R. at 693-94.) (emphasis added.) In other words, it was to Plaintiff's *benefit* that the ALJ diminished the weight given to Dr. Marshall's opinion.

The ALJ's conclusion is supported by substantial evidence. As a preliminary matter, the ALJ noted that Dr. Marshall, a State agency reviewer, was able to examine Plaintiff, which is incorrect. Plaintiff argues that this misstatement "clearly colored the ALJ's perception of Dr. Marshall's role . . ." and asserts that this misstatement supports a remand. (DE 20 at 43.) However, there is no indication that this misstatement was detrimental to Plaintiff or led to a less restrictive RFC. To the contrary, the ALJ indicated that he was assigning only partial weight to Dr. Marshall's opinion because a *more restrictive RFC* was warranted. Indeed, as the Commissioner points out, if Dr. Marshall had seen

23

Plaintiff it would have made the ALJ assign *more* weight to the opinion.  I do not find any reason for reversible error related to the ALJ's harmless misstatement.

Further, the Social Security Administration's Programs Operations Manual System ("POMS") clarifies that the "Moderately Limited" box Dr. Marshall checked is simply part of a worksheet that "does not constitute the [doctor's actual] RFC assessment."  POMS DI § 24510.060(B)(2), *available at* https://secure.ssa.gov/poms.nsf/lnx/0424510060 (last visited July 6, 2017); *see also Kirves v. Callahan*, 113 F.3d 1235 (6th Cir. 1997) (unpublished) (noting that this circuit views POMS as persuasive authority); *Joiakim v. Comm'r of Soc. Sec.*, No. 10-11079, 2011 WL 1120043, at *6 (E.D. Mich. Mar. 8, 2011) *report and recommendation adopted* 2011 WL 1134655 (E.D. Mich. Mar. 25, 2011); *Velez v. Comm'r of Soc. Sec.,* No. 1:09–CV–0715, 2010 WL 1487599, at *6 (N.D. Ohio Mar.26, 2010) ("In general, the decisions have respected the Commissioner's argument the ALJ is not required to include the findings in Section I in formulating residual functional capacity").  Checking the box "Moderately Limited" indicates only that the claimant's capacity is impaired, but does not indicate the degree and extent of the limitation. *See id.* § 24510.063(B) (2).  Instead, the reviewer must record "the actual mental RFC assessment" in Section III.  *Id.* at § 24510.060(B)(4).  Here, Dr. Marshall's narrative description in Section III explains that Plaintiff has the ability to do rote tasks, follow instructions, and work with

24

others, but cannot perform complex tasks.  (R. at 421.)  The ALJ's ultimate RFC is consistent with this assessment.  Accordingly, I find no error in the ALJ's weighing of Dr. Marshall's opinion.

### c.    Elaine Tripi, Ph.D.

As discussed above, the ALJ assigned little weight to Dr. Tripi's December 21, 2010 assessment.  (R. at 695, 475-77.)  He noted that Dr. Tripi's statements that Plaintiff "was not a viable rehabilitation candidate" was an administrative finding dispositive of the case and therefore was not entitled to controlling weight. (R. at 695.)  He found her opinion to be inconsistent with the medical evidence and record as a whole, including subsequent mental health treatment, mental status examination findings, and Plaintiff's reported activities of daily living.

Plaintiff asserts that the ALJ erred in his conclusion because he should have given more weight to Dr. Tripi's statements that Plaintiff gave up on the intelligence tests because she could not focus and concentrate.  According to Plaintiff, the ALJ should have used this information to evaluate her ability to work in a hypothetical job setting.  As to the IQ score Dr. Tripi assigned, Plaintiff asserts that the ALJ should have referred her for another IQ evaluation if he did not believe Dr. Tripi's results were valid.

Plaintiff's argument is unavailing.  As addressed in Sections (E)(1) and (2) of this Report, *supra*, the ALJ clearly considered Dr. Tripi's opinion; he also gave

good reasons for discounting it.  He was not required to further develop the record

because Plaintiff has not established that "such an examination is *necessary* to

enable the administrative law judge to make a disability decision."  *Landsaw v.*

*Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (internal

quotation omitted) (emphasis in original).  As explained iabove, there is substantial

evidence in the record to support the ALJ's conclusion.

### d.    Aaron Anderson, D.O.

Dr. Anderson examined Plaintiff on March 23, 2013 and assessed her as able

to lift up to ten pounds frequently, which was described as "one-third to two-thirds

of the time."  (R. at 616.)  The ALJ assigned partial weight to the opinion, noting

that it seemed to rely on Plaintiff's subjective complaints, which he had already

found to be less than credible.  (R. at 693.)

Plaintiff argues that Dr. Anderson  "mistakenly" marked "frequently" and

should have instead indicated that she could "occasionally" lift and carry up to ten

pounds, equating to only "'one-third' of the working day." (DE 20 at 46.)  She

asserts that if the ALJ had used the "occasional" limitation as Dr. Anderson *meant*

to opine, she would have been found disabled.  This argument is unclear.  First,

Plaintiff contends that the ALJ recognized that the lifting limitations found by Dr.

Anderson "puts her at sedentary."  (DE 20 at 47, citing R. 693.)  However, this

reference, which actually refers to "less than sedentary work," does not appear in

ALJ Blair's December 7, 2015 opinion, but instead in the now-vacated May 22, 2013 opinion. (Compare R. at 30 with R. at 693.); *see, e.g.,* I-3-7-1, *Remands – General,* HALLEX. Accordingly, the statement matters little to the instant decision. Plaintiff does not challenge the ALJ's actual statements that he discounted Dr. Anderson's opinion because it was based on Plaintiff's subjective report of her symptoms, which he did not find to be credible. Nor does she challenge that credibility finding.

Second, there is no indication that Dr. Anderson incorrectly marked the form and it is unclear on what evidence Plaintiff relies to support her theory. The form explicitly defines "frequently" as "one-third to two-thirds of the time," both in the definition section at the top of the page and in each section in which a decision must be made. (R. at 616.) Dr. Anderson's narrative assessment does not indicate that she can only lift up to ten pounds occasionally. (R. at 613-615.) Instead, he notes that her strength is "5/5 throughout" with motor and sensory function intact. (R. at 615.) Substantial evidence supports the ALJ's decision to rely on the evidence submitted by Dr. Anderson and to assign it only partial weight.

### e. Dawn Gventer, Psy.D.

Dr. Gventer examined Plaintiff on behalf of the State agency on March 27, 2013. (R. at 629-633.) She diagnosed Plaintiff with major depressive disorder and noted that her immediate memory, concentration, and fund of knowledge were

impaired.  (R. at 632-33.)  However, Dr. Gventer indicated that her recent memory

was intact and she had appropriate judgment and insight.  (R. at 633.)  She

described her prognosis as "fair."  (R. at 632.)

Dr. Gventer also completed a Medical Source Statement ("MSS") in which

she indicated that Plaintiff had marked limitations in the ability to understand and

carry out detailed instructions and make judgments on simple work-related

decisions.  (R. at 636.)   The ALJ assigned little weight to the opinion, because it

was inconsistent with medical evidence and the record as a whole, "including Dr.

Gventer's own narrative report and mental status examination, which do not fully

support the extent of limitation she proposed." (R. at 694.)  The ALJ's conclusion

is supported by substantial evidence.  Specifically, Dr. Gventer's opinion is

internally inconsistent in several ways.  First, although she indicated on the MSS

that Plaintiff was markedly limited in her ability to make judgments, she assessed

Plaintiff as having "appropriate insight and judgment" in her narrative assessment.

(R. at 633.)  Second, she indicated on the MSS form that Plaintiff's stress and

depressed mood "will prevent work success," but noted in her narrative assessment

that Plaintiff "had a fair prognosis," was "oriented in all spheres," and merely that

her depressed mood "may impact her ability to work appropriately in a work

related setting . . . ."  (R. at 633, 637.)  Moreover, Dr. Gventer's statement that

Plaintiff would not be successful at work is not a medical opinion but an

28

administrative finding dispositive of the case and therefore was not entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d).

The ALJ also pointed to inconsistencies with the record as a whole as a reason to discount the opinion, and there is substantial record evidence of such inconsistency. For example, there is a significant amount of evidence that Plaintiff's depression is stable with medication, which undercuts Dr. Gventer's opinion that her depression would prevent work success. (R. at 536, 1103, 1174, 1182, and 1229.) As recently as October 9, 2015, Plaintiff reported to Sarah Scantaburio, P.A., that her medications "work well" with no side effects. (R. at 1247.) As such, there is substantial evidence in the record to support the ALJ's decision to discount Dr. Gventer's opinion.

### f.     Paul Haduck, D.O.

Dr. Haduck saw Plaintiff in 2009-2010 and, on July 13, 2009, noted that Plaintiff was "unable to work/attend school" until further notice. (R. at 438.) The ALJ assigned little weight to Dr. Haduck's opinion for several reasons. First, he again noted that statements that a Plaintiff is disabled are issues reserved to the Commissioner and therefore not entitled to special deference. Second, he found the opinion inconsistent with other substantial evidence in the record, including Dr. Haducks "own minimal and largely illegible treatment notes." (R. at 695.)

29

Finally, he found the opinion to be vague and to not "actually describe any specific functional limitations . . . ."  (R. at 695.)

Plaintiff argues that it is not apparent that the ALJ read Dr. Haduck's treatment notes and, if he found them illegible, he should have asked for a typed copy.  She provides her own summary of "what was able to be discerned" from the treatment notes.  According to Plaintiff, the ALJ failed to follow the Appeals Council's September 1, 2015 instructions to "evaluate all the opinions of record, including those of . . . Dr. Haduck, pursuant to the provisions of 20 C.F. R. 404.1527 . . . ."  (R. at 774.)

Of all of the opinions with which Plaintiff takes issue, Dr. Haduck is the only treating physician.  As such, the ALJ must evaluate the opinion and provide good reasons for failing to assign controlling weight.  I find that he did so in this case, consistent with both the Appeals Council's order and the regulations.

The ALJ is correct that Dr. Haduck's statement that Plaintiff was unable to work is a matter reserved to the Commissioner and therefore not entitled to any special deference.  20 C.F.R. § 404.1527(d).  The ALJ was entitled to discount the opinion if it was not supported by the record as a whole.  S.S.R. 96-5p.  Here, he found that the opinion was inconsistent with both the record as a whole, objective medical studies, Plaintiff's report of daily activities, and Dr. Haduck's own treatment notes.  Inconsistency with the record as a whole is a sufficient reason for

rejecting the opinion of a treating physician. *Price v. Comm'r of Soc. Sec.*, 342 F.

App'x 172, 176 (6th Cir. 2009) (concluding that the ALJ properly rejected a

treating physician opinion that was not supported by objective medical evidence);

*Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (the ALJ is "not bound by

conclusory statements of doctor, particularly where they are unsupported by

detailed objective criteria and documentation.") (internal quotation omitted); *White

v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) (an ALJ's finding that a

medical opinion conflicts with other evidence in the record is sufficient to discount

the opinion.).

The ALJ also found Dr. Haduck's opinion to be vague and provide nothing

to specify the functional limitations that would prevent Plaintiff from working.

This is persuasive because the opinion *is* quite vague, and is written on a form

letter with Plaintiff's personal information filled in where necessary.  It provides

no information as to *why* Plaintiff was unable to work during that time period.  (R.

at 438.)  Further, the ALJ was not required to ask for a typewritten version of Dr.

Haduck's notes because Plaintiff's counsel prepared a typewritten case

chronology, including a description of Dr. Haduck's notes, on which the ALJ

relied.  (R. at 464-66, 469, and 686.)  Moreover, Plaintiff "has the ultimate burden

to establish an entitlement to benefits by proving the existence of a disability," and

could also have requested typed notes from Dr. Haduck.  *Moon v. Sullivan*, 923

F.2d 1175, 1181 (6th Cir. 1990). I find no error in the ALJ's discounting of the opinion and find that he complied with the applicable regulations by providing good reasons for doing so.

### g.    Plaintiff's RFC

Finally, Plaintiff asserts that by discounting the opinion evidence in the record, the ALJ impermissibly substituted his own medical judgment for that of a physician when assessing her RFC. Pursuant to 20 C.F.R. § 404.1527(d), the RFC assessment is the sole purview of the ALJ. However, there is significant case law in this district confirming the general principle that the ALJ "must generally obtain a medical expert opinion" when formulating the RFC unless the "'medical evidence shows relatively little physical impairment' such that the ALJ can permissibly render a commonsense judgment about functional capacity[.]" *Guido v. Comm'r of Soc. Sec.*, No. 13-cv-13520, 2014 WL 4771929, at *12 (E.D. Mich. Sept. 24, 2014) (quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)); *see also Gross v. Comm'r of Soc. Sec.*, No. 2:16-cv-10365, 2017 WL 1151099, at *4 (E.D. Mich. Mar. 28, 2017) (collecting cases). In short, the district court cases cited above do not require the ALJ to entirely base his or her RFC finding on the opinion of a physician, but they require the ALJ's RFC assessment be supported by substantial evidence and not merely on the ALJ's own medical interpretation of the record.

32

Further, in order to make a decision on this issue, this Court "may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result." *Pollacia v. Comm'r of Soc. Sec.*, No. 09-cv-14438, 2011 WL 281044, at *6 (E.D. Mich. Jan. 6, 2011); *see also Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (requiring an appellate record that would "permit meaningful review" of the ALJ's application of the rules). Here, such an accurate and logical bridge exists. The ALJ cites extensively to the medical evidence in the record and summarizes his reasons for assessing Plaintiff's RFC. There is no indication that he merely relied on his own medical knowledge and his RFC is supported by substantial evidence in the record.

### 4.    Hypothetical to the Vocational Expert

Plaintiff's final argument is a challenge to the ALJ's hypothetical question to the Vocational Expert ("VE"). Specifically, she takes issue with the following question, in which the ALJ asked whether a hypothetical individual who was limited to light work with the following limitations would be capable of competitive employment:

> [S]hould never use ladders, scaffolds or ropes; should avoid concentrated exposure to wetness, humidity, to fumes, odors, dusts, gases, and respiratory irritants; should do no over the shoulder reaching; may frequent [sic] but not constant to handling and finger; should avoid exposure to hazards, including dangerous and unprotected machinery or work at unprotected heights; should have

only simple, unskilled work, with one, two, or three-step instructions;
no jobs involving concentration, no detailed or precision tasks, multi-
tasking, or reading, computing, calculating or problem solving.

Work which does not require contact with, with the general public and
no fast-paced production work or work which is dictated – which the
pace is dictated by others.

(R. at 725.) The VE replied that Plaintiff's past work would be excluded because it

was semi-skilled, but that there were other unskilled jobs in the national economy

that could be performed, such as hand packagers, with approximately 46,000

positions nationally and 2,300 in Michigan, assembly workers, with 42,500

positions nationally and 1,200 in Michigan, and testers or inspectors, with 20,000

positions nationally and 1,000 in Michigan. (R. at 726.)

Plaintiff argues that the above hypothetical failed to accurately portray her

limitations by omitting the moderate limitations assessed by Dr. Marshall. As

addressed above, however, the ALJ accurately discounted the moderate limitations

assessed by Dr. Marshall. Accordingly, there was no error in his hypothetical to

the VE.

## F. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes

that substantial evidence supports the ALJ's decision denying benefits to Plaintiff.

Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for

summary judgment (DE 19), **GRANT** Defendant's motion for summary judgment

(DE 23), and **AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: July 17, 2017                    s/Anthony P. Patti
                                        Anthony P. Patti
                                        UNITED STATES MAGISTRATE JUDGE

### Certificate of Service

I hereby certify that a copy of the foregoing document was sent to parties of record on July 17, 2017, electronically and/or by U.S. Mail.

                                        s/Michael Williams
                                        Case Manager for the
                                        Honorable Anthony P. Patti

36